## Craig, et al. v. O'Rear, et al.

(Decided May 15, 1923.)

### Appeal from Franklin Circuit Court.

1. Constitutional Law—Courts Can Declare Statutes Unconstitutional. —The right of courts to declare an act unconstitutional has been settled by a long line of decisions from which there is no dissent.
2. Constitutional Law—Statute Not Invalid Because Unwise, Unnecessary, or Opposed to Best Interests.—The propriety, wisdom, and expediency of legislation is exclusively a legislative question, and courts cannot declare a statute invalid because in their judgment it may be unnecessary, or opposed to the best interests of the state.
3. Constitutional Law—Statute Cannot be Declared Invalid as Contrary to General Nature of Government or Spirit of Liberty.—A statute will not be declared void on the ground that it is opposed to the spirit pervading the Constitution, or is against the nature and spirit of government, or contrary to the general principles of liberty or the genius of a free people.

4.  Constitutional Law—Every Doubt Resolved in Favor of Validity
    of Statute.—Courts should always proceed with the greatest possi-
    ble caution in declaring a statute invalid, and should never do so
    until after they resolve every doubt in its favor, and are then
    able to say that it is plainly repugnant to the Constitution.

5.  Constitutional Law—Legislature May Appoint Temporary Agents
    for Particular Task.—The appointment by the legislature of mere
    temporary agents to perform a particular task, to serve without
    term and without pay, and whose functions cease when the pur-
    pose is accomplished, is not, like the appointment of officers, an
    exercise of executive power by the legislature, contrary to Con-
    stitution, sections 27, 28. .

6.  Constitutional Law—Legislature Can Delegate to Presiding Offi-
    cers Authority to Appoint Members of Commission.—Under Con-
    stitution, section 93, giving the legislature authority to determine
    by whom the appointment of all inferior officers and agents may
    be made, which is subject to the qualification that it may · not
    appoint officers itself, the legislature may authorize the speaker
    of the house and the president of the senate to appoint the mem-
    bers of a commission to establish normal schools, even if those
    members are regarded as officers, and not mere temporary agents.

7.  Constitutional Law—Legislature May Confer Discretion in Ad-
    ministration of law.—The rule that the legislature may not dele-
    gate its legislative powers means that it may not delegate the
    exercise of its discretion as to what the law shall be, but not that
    it may not confer discretion in the administration of the law
    itself.

8.  Constitutional Law—Statute Held Not to Delegate Discretion as
    to Whether Schools Should be Founded.—Acts 1922, chapter 10,
    entitled "An act to provide for the establishment of two normal
    schools," which created a commission authorized and empowered
    to establish such schools, did not vest in the commission au-
    thority to determine whether the schools should be established,
    in view of the provisions of section 1, that one school should be
    located in the western part of the state, and one in the eastern
    part, of section 2, that when established the schools should be
    controlled by the state board of education, and of section 3, mak-
    ing an appropriation for the maintenance and operation of each
    of the schools.

9.  Constitutional Law—Delegation of Discretion to Determine Loca-
    tion of Normal Schools Held Valid.—A delegation of discretion to
    a commission to carry out the legislative will for the establish-
    ment of two normal schools, by selecting the sites and providing
    suitable buildings properly equipped at the expense of the towns
    furnishing the sites, as was done by Acts 1922, chapter 10, is not
    invalid as a delegation of legislative power, contrary to Constitu-
    tion, sections 27, 28.

10. Statutes—Requirement that One Normal School Should be in
    Eastern Half and One in Western Half of State is Not Too In-
    definite.—The provision of Acts 1922, chapter 10, that one of

the two normal schools to be established thereunder should be located in the western half of the state, and the other in the eastern half, is not so indefinite as to invalidate the act, especially since the commission had no difficulty in locating the schools in conformity therewith.

11. Officers—Failure to Fix Term of Commissioners to Perform Particular Task Does Not Invalidate Act.—A statute creating a commission to perform a particular task, and whose functions would cease when the task was performed, is not invalid because it fails to fix the term of office of the commissioners.

12. Schools and School Districts—Failure to Provide for Filling Vacancies on Commission to Establish Normal Schools Does Not Invalidate Act.—The omission from Acts 1922, chapter 10, creating a commission to establish two normal schools, of any provision for filling vacancies which might occur in the commission, does not invalidate the act.

13. Schools and School Districts—Act Intrusting Management of Normal Schools to Board of Education Does Not Confer Arbitrary Power.—Acts 1922, chapter 10, section 3, providing that the management and control of the two normal schools to be established thereunder shall be vested in the state board of education is not invalid, as conferring arbitrary power on the board, but gives to the board only that power usually exercised by persons having control of similar institutions.

14. Schools and School Districts—Commission to Establish Normal Schools Held Not Authorized to Appoint Faculty.—Acts 1922, chapter 10, authorizing a commission to establish two normal schools, did not authorize the commission to select faculties for such schools, in view of the provision of section 3 of that act that the schools, after their establishment, should be under the management and control of the board of education.

CHAS. I. DAWSON, Attorney General, S. Y. TRIMBLE and R. T. CALDWELL for appellants.

JOHN D. CARROLL for appellees Citizens of Murray and Morehead.

E. C. O'REAR for appellee Normal School Commission.

OPINION OF THE COURT BY JUDGE CLAY—Affirming on original and cross appeals.

At the last session of the General Assembly, it passed the following act, now designated as chapter 10 of the Acts of 1922:

"AN ACT to provide for the establishment of two normal schools for the training of white elementary teachers, and appropriating moneys for the maintenance and operation thereof.

"Whereas, the greatest need of common schools is trained elementary teachers, and

"Whereas, the state normal schools already established can neither reach nor train all the elementary teachers needed for the common schools; therefore,

"Be it enacted by the General Assembly of the Commonwealth of Kentucky:

"1. That a commission is hereby created, to be known as the State Normal School Commission, consisting of eight members who are citizens of the state of Kentucky and over the age of twenty-one years, to be appointed as follows: Five by the speaker of the House of Representatives and three by the president of the Senate, which is hereby authorized and empowered to establish two new normal schools for the training of white elementary teachers, one to be located in the western part of the state and one to be located in the eastern part of the state. The said commission is hereby authorized to receive gifts of land, buildings or money for the establishment of these two normal schools for white elementary teachers.

"2. The management and control of these two normal schools, when established, shall be and is hereby vested in the state Board of Education.

"3. There is hereby appropriated, out of the general funds of the state, to each of these two normal schools, for maintenance and operation, the sum of thirty thousand dollars annually. The auditor of the Commonwealth is directed to draw his warrants for said sums, above appropriated, upon requisitions signed by the chairman and secretary of the State Board of Education. Provided, that the above appropriation for maintenance and operation shall not become available for said normal schools until the said commission has received for each of said schools gifts of land suitable to the purposes of each school, and also gifts of buildings or money, or both, equivalent in value to at least one hundred thousand dollars. Provided, further, that if gifts and donations are made, sufficient to establish one of said schools, then the sum of thirty thousand dollars shall be available for the maintenance and operation of said school.

"4. All laws and parts of laws in conflict with the provisions of this act are hereby repealed.

"5. If any section of this act shall be held unconstitutional the remainder of the act shall not be affected thereby."

Pursuant to the authority conferred by the act, the speaker of the House of Representatives appointed five members of the commission, and the president of the Senate appointed three members of the commission. The commission organized, and, after several meetings and hearings, selected Murray in the western part of the state and Morehead in the eastern part of the state as suitable sites for the proposed schools. Murray conveyed to the commission a tract of land which it purchased for $16,000.00, and turned over to the commission the sum of $100,000.00. It also appears that Murray recently erected at a cost of more than $100,000.00 a good school building, well adapted for a normal school, and that the school authorities have tendered, and the commission has accepted, this building for use until a new building can be erected. Morehead was selected on the condition that it comply with the act by making gifts of land suitable to the purposes of the school, and also gifts of buildings or money or both, equivalent in value to at least $100,000.00, but at the time this litigation began, the condition had not been complied with.

When the commission announced the establishment of the schools at Murray and Morehead, several suits involving the validity and construction of the act were filed in the Franklin circuit court, which rendered judgment upholding the validity of the act, and the right of the commission to establish the schools by erecting and equipping the buildings, but not the right to select the faculties of the schools. From that judgment this appeal is prosecuted.

The right of courts to declare an act unconstitutional has been settled by a long line of decisions from which there is no dissent, but, as the legislature is a separate and independent department of goverment invested by the Constitution with the power to make laws, the courts have fixed certain rules for their own guidance in order that the power to declare an act invalid may not be exercised too freely. In the first place, the propriety, wisdom and expediency of legislation is exclusively a legislative question, and courts are not at liberty to declare a statute invalid because, in their judgment, it may be unnecessary, or opposed to the best interests of

the state. McCray v. U. S., 195 U. S. 27, 49 L. Ed. 78.
Another rule is that an act will not be declared void
on the ground that it is opposed to the spirit supposed
to pervade the Constitution, or is against the nature and
spirit of the government, or is contrary to the general
principles of liberty, or the genius of a free people.
Jacobson v. Massachusetts, 197 U. S. 11, 25 S. Ct. 358,
3 Ann. Cas. 765; Humes v. Mo. Pac. Ry. Co., 82 Mo.
221, 52 Am. Rep. 369; Henley v. State, 98 Tenn. 665, 41
S. W. 352, 1104, 39 L. R. A. 126. A third rule is that
courts should always proceed with the greatest possi-
ble caution, and should never declare an act invalid
until after they resolved every doubt in its favor, and
are then able to say that it is plainly repugnant to the
Constitution. U. S. v. City of Quincy, 4 Wall. 535, 18
U. S. L. Ed. 403; Nashville v. Cooper, 6 Wall. 247, 18
L. Ed. 851; Wiggins Wire Fence Co. v. Patterson, 166
Ky. 278, 179 S. W. 224.

The act is assailed on the ground that it violated sec-
tions 27 and 28 of the Constitution, which separate the
government into three departments, legislative, execu-
tive and judicial, and provide that the powers of one
shall not be exercised by either of the others. The first
objection to the act is that it is an assumption of execu-
tive power by the legislature. Sibert v. Garrett, 197
Ky. 17, 246 S. W. 455, is relied on. That case merely
held that appointment to office was an executive func-
tion which could not be exercised by the legislature it-
self. The court, however, was careful to point out that
the rule was confined solely to the appointment of offi-
cers and was not intended to apply to mere temporary
agents. While the purpose of the language employed
was to call attention to the exception to the rule, and
cannot be regarded as controlling, practically all of the
courts hold that mere temporary agents appointed to
perform a particular task, who serve without term and
without pay, and whose functions cease when the pur-
pose is accomplished, may be appointed by the legisla-
ture itself, or in any manner that it may provide, and
we have no doubt of the correctness of this view. Mc-
Arthur v. Nelson, 81 Ky. 67; David v. Portland Water
Committee, 14 Or. 98, 12 Pac. 174; State v. Hocker, 63
A. S. R. 174, and notes on p. 189. But if we go further
and assume that the members of the commission were
officers and not agents, clearly the rule announced in

the Sibert case has no application. The ruling there was simply that the legislature itself could not make appointments to office. It was not held that the legislature could not confer the power of appointment on others. Manifestly, if the legislature can neither appoint nor confer the power of appointment on others, then every inferior officer and employe in the state is serving without right, for all of them hold their offices or positions by virtue of appointments made by persons who derive their authority to appoint from statutes enacted by the legislature. As far as we are aware, there is no dissent from the proposition that the legislature may create offices and confer the power of appointment on others, in the absence of a constitutional provision requiring the appointment to be made by a particular person. The reason for the rule is that the legislature does not exercise an executive function when it confers the power of appointment on some one else. Here, the legislature did not appoint the members of the commission, but authorized the speaker of the House and president of the Senate to make the appointments. Therefore, the legislature did not perform an executive act, but conferred the power of appointment on others who had the right to act in an executive capacity. It follows that whether the members of the commission be regarded as mere temporary agents, or as officers exercising a portion of the sovereignty of the state, the manner of their selection was not repugnant to any provision of the Constitution.

City of Harlan v. Coombs Land Co., 198 Ky. 199, — S. W. —, does not support a contrary view. The question there was whether the council could confer on the mayor power to contract with a competent engineer to supervise certain street improvements. As the charter of the city vested the board of council with the power to elect a city engineer, section 3558, Ky. Stats., it was held that the power thus delegated could not be delegated by the council to the mayor. If there were an express provision of the Constitution conferring upon the legislature the power to appoint all inferior officers and agents, there might be some analogy between the two cases. As a matter of fact, however, the Constitution contains no such provision. Therefore, no question of the delegation of a delegated power is presented. On the contrary, the case is one where the legislature is given full power to determine by whom the appointment

of all inferior officers and agents may be made, section 93, Constitution, subject to the qualification laid down in the Sibert case, that it may not itself make appointments to office.

We may also add in this connection that the argument that the legislature cannot confer on the speaker and the president of the Senate the power to appoint legislative agents loses all its force when we recall that the members of the commission are not mere legislative agents, but are ministerial agents of the state, clothed with temporary power to act for and on behalf of the state in the execution of one of its laws.

It is next insisted that the act is void as a delegation of the functions of the legislature. It must not be overlooked that legislatures are not continuous bodies. As a rule, they are in session for only a few days each year, or every two years, as is the case in Kentucky. Of necessity such bodies cannot undertake to determine all facts incident to the administration of the laws which they enact. Therefore when we say that the legislature may not delegate its powers, we mean that it may not delegate the exercise of its discretion as to what the law shall be, but not that it may not confer discretion in the administration of the law itself. In re Chapman, 166 U. S. 661, 41 L. Ed. 1154. The books are full of cases upholding the power of the legislature to confer on boards, bureaus and commissions the power to carry out the legislative will. Thus it has been held that the legislature may delegate to the State Board of Forestry the power to fix charges for the inspection of roadside trees to determine the conditions under which permits for cutting and trimming them shall be issued; Chesapeake, &c., Telegraph Co. v. Goldsboro, 125 Md. 666, 94 A. 322; that a commission may be created by the legislature with power to select uniform text books for use in the schools, and to award contracts for furnishing the books selected; Leeper v. State, 103 Tenn. 500, 53 S. W. 962, 48 L. R. A. 167; that the legislature may delegate to a commission power to determine when and where a common carrier shall establish stations and stop trains; State v. Ogden Rapid Transit Co., 38 Utah 242, 112 P. 120; to require a railroad company to erect a depot, State v. Corvallis, etc., R. Co., 59 Or. 206, 117 P. 980; to classify railroads according to their charter and the gross earnings of each, New Orleans, &c., R. Co. v. State,

110 Miss. 290, 70 S. 355; to determine what improvements or additions to a railroad company's rolling stock, stations or terminal facilities are reasonable and expedient, People v. Delaware, etc., Canal Co., 32 App. Div. 120, 52 N. Y. S. 850 (Aff. 165 N. Y. 362, 59 N. E. 138); to require the construction of a spur track, St. Louis, &c., R. Co. v. State, 94 Ark. 1, 136 S. W. 938; Union Lime Co. v. State R. Comm., 144 Wis. 523, 129 N. W. 605; to determine the number of street railroad tracks to be laid across a bridge; Conn. Co. v. Norwalk, 89 Conn. 528, 94 A. 992; to establish a uniform standard of cars to be used; St. Louis, etc., R. Co. v. Taylor, 210 U. S. 281, 52 L. Ed. 1061, etc. The legislature may delegate to the racing commission the power to determine what purses shall be offered. Douglas Park Jockey Club v. Talbott, 173 Ky. 685, 191 S. W. 474. Following the same rule, it has often been held that the legislature may authorize a board or commission to select the location for a state institution, or a site for a public building. Thus in State v. Bryan, 50 Fla. 293, 39 S. 929, an act empowering the state board of education and the state board of control, acting in joint session, to determine the place of location of the University of the State of Florida and of the Florida Female College was upheld on the ground that the power conferred was not a delegation of legislative power. In People v. Dunn, 80 Cal. 211, 22 Pac. 140, 13 A. S. R. 118, an act conferring on certain persons the power to select the site for a public building proposed to be constructed was sustained, the court saying, "The mere act of selecting a site to be purchased is not a legislative act." In Territory, ex rel. Smith, Dist. Atty. v. Scott, 3 Dak. 357, 20 N. W. 401, the court ruled that an actual selection of a suitable location for a seat of government, and the erection of buildings and improvements thereon, were acts of an administrative character, and that the statute conferring these powers on certain commissioners was not void as a delegation of legislative power. In Fleckten v. Lamberton, 69 Minn. 187, 72 N. W. 65, it was held that the legislature might create a board of public officers for the purpose of purchasing a site for, and superintending the erection of, a state capitol thereon, and expending the moneys appropriated for that purpose. In Davenport v. Elrod, 20 S. Dak. 567, 107 N. W. 833, an act authorizing the State Capitol Commission to pro-

cure the erection of a building, and adopt plans and specifications, was declared not to be unconstitutional as a delegation of legislaitve power. In State v. McGraw, 13 Wash. 311, 43 Pac. 176, an act giving power to the State Capitol Commission to select plans and erect a state capitol on the old site, at a cost not to exceed a million dollars, was held not to be invalid on the ground that it was a delegation of legislative power. These cases sufficiently illustrate the rule, but it is said that the act in question is invalid because it delegated to the commission the power to determine whether or not the two normal schools should be established. The argument is that the statute merely authorized and empowered the members of the commission to establish two new normal schools, without requiring them to act. With this contention we cannot agree. The title of the act is, "An act to provide for the establishment of two new normal schools for the training of white elementary teachers, and appropriating moneys for the maintenance and operation thereof." The words, "which is hereby authorized and empowered to establish two new normal schools for the training of white elementary teachers," are immediately followed by the words, "one to be located in the western part of the state, and one to be located in the eastern part of the state." In section 2 we find the following: "The management and control of these two normal schools, *when established,* shall be and is hereby vested in the State Board of Education." Section 3 appropriates $30,000.00 annually for the maintenance and operation of each of the schools, with the provision that "the appropriation shall not become available until it receives for each of said schools gifts of land suitable to the purposes of each school, and also gifts of buildings or money or both, equivalent in value to at least one hundred thousand dollars." Considering the act in the light of its title, and the appropriation made for the maintenance of the schools, together with the provisions that one of the schools was to be located in the eastern part of the state and the other in the western part of the state, coupled with the further provision that the schools, *when established,* should be under the management and control of the State Board of Education, there can be no doubt, we think, that the legislature intended to provide for the establishment of the schools, and not to make their establishment discretion-

ary with the members of the commission. That being true, the only power conferred on the commission was to carry out the legislative will by selecting the sites and providing suitable buildings properly equipped at the expense of the towns furnishing the sites. Clearly, if the legislature could confer on commissions the numerous powers above referred to, it could confer on the commission in question the power to perform the simple act of establishing the two schools, especially in view of the fact that no expenditure of the state's money was involved, and even the appropriation for the maintenance of the schools was not available until the commission had complied with the minimum standard fixed by the act; that is, had accepted "for each of said schools gifts of land suitable to the purposes of each school, and also gifts of buildings or money, or both, equivalent in value to at least one hundred thousand dollars."

But is is said that State v. Bryan, *supra,* is not in point, for in that case the agency appointed to fix the location of the state university was empowered only to determine the facts according to elaborately prescribed requirements. The precise language of the act with respect to the location of the University of Florida is as follows:

"Sec. 17. In determining the location of the University of the State of Florida created and established by this act, the said boards in joint meeting assembled shall take into consideration the lands, property, buildings and situation of the respective institutions named in and abolished by this act, having regard to the permanent location of such an institution at some central point in this state, both geographically and as to population, as well as to the needs and requirements of the same as prescribed in this act and the powers given thereunder, and the funds and means at their command, or which may naturally come to the control of the state board of education for such purposes, and may, if advisable, after careful consideration, appropriate either temporarily or permanently, the location, lands, buildings, property and effects of any one of the said vacated and abolished institutions for such purpose. *Said boards being hereby vested with an absolute discretion and power in matter of location and situs of this said institution.*"

With respect to the act under consideration, the requirements are as follows: (1) One of the schools was to be located in the eastern part of the state, and the other in the western part; (2) gifts of land *suitable* to the purposes of each school; (3) also gifts of buildings or money, or both, equivalent in value to at least one hundred thousand dollars. All that is necessary is a comparison of the two acts to show that the discretion conferred on the Kentucky commission is no broader than that conferred under the Florida act. Indeed, the case before us is all the stronger, because the Florida act gave to the agency appointed to select the site for the university a wide discretion as to the expenditure of the state's funds, while the Kentucky act gives to the commission no power whatever to spend a single dollar of the state's money in the establishment of the two schools. As the legislature passed the law and entrusted its administration to the commission under certain definite restrictions which sufficiently safeguarded the expenditure of the public funds, the contention that the act is invalid on the ground that it is a delegation of the law-making power cannot be sustained.

Another contention is that the act is so vague, indefinite and incomplete that it cannot be told with reasonable certainty what the legislature intended. In the first place, it is said that the act provides for the location of one of the schools in the eastern part of the state and for the other in the western part of the state, without fixing a dividing line, or providing any means for its ascertainment. The maxim, "That is certain which may be rendered certain," applies. Doubtless the legislature felt that even in the present benighted state of education in this Commonwealth, the members of the commission might discover an old map that was not too faded to furnish the desired information. Not only so, but the members of the commission actually located one of the schools in the eastern part of the state and the other in the western part of the state, and it would be verging on the absurd for us to say that no one could tell with reasonable certainty what was intended by the act, when those charged with its administration found no difficulty whatever in deciding that question. It is further said that the act is indefinite in that it does not fix the tenure of office of the commissioners, and makes no provision for filling vacancies. Clearly, there was

no necessity for fixing a term of office. The commissioners were appointed to accomplish a particular task, and their functions will cease when that task is completed. We have never known an act providing for the appointment of either officers or agents to be declared invalid on the ground that it contained no provision for the filling of vacancies. The omission of such provision from the act might present some difficulty in case a vacancy occurred, but would furnish no reason for holding the entire act invalid.

But it is urged with great earnestness that the act is invalid because it confers arbitrary power on the State Board of Education. The language of the act is, "The management and control of these two normal schools, when established, shall be and is hereby vested in the State Board of Education." The argument is that this language confers on the State Board of Education the unbridled power to do as it pleases. From the foundation of our state up to the present time there can scarcely be found a single act providing for the establishment of a board to administer a state institution that does not contain the same language. Similar powers are conferred on the boards of education of every city in the Commonwealth, and on the boards of regents of the two normal schools already established. It is true that specific powers are also conferred, but that fact neither adds to, nor detracts from, the validity of the general grant of power. The State Fair act of 1902 contained the following language: "That in order to relieve the said State Fair of any political appearance, the same is to be under the management and control of the Board of Directors of the Kentucky Live Stock Breeders' Association," Acts 1902, c. 112, and this act was sustained. Ky. Live Stock Breeders' Assn. v. Hager, Auditor, 120 Ky. 125, 85 S. W. 738. Afterwards the State Fair act was amended in the year 1906, so as to read as follows: "The management and control of this State Fair shall be in the hands of the State Board of Agriculture, Forestry and Immigration, and said board shall determine the time for holding said fair each year." Chapter 99, section 2, Acts 1906; section 4618b-2, Kentucky Statutes. It will thus be seen that if the act in question is invalid for the reason named, many other important acts must fail for the same reason. In view of the seriousness of the question, we must keep our feet on the ground and

listen to the voice of common sense. Cases declaring invalid acts conferring on boards certain police powers respecting the rights of citizens, without furnishing any standard for their action, are not in point. The case is simply one where the legislature saw fit to confer on a state agency the very simple power of managing two schools. It is our duty to construe the act so as to uphold its validity if that can be done. What, then, is the power which the legislature intended to confer on the State Board of Education? The answer is, only that power usually exercised by persons having control of similar institutions; in other words, the power to select the faculties and make rules and regulations for the admission of pupils and the general conduct of the schools, with the implied restriction that these rules and regulations shall not be unreasonable or discriminatory, but shall be such as will carry out in a natural and sensible way the legislative purpose in establishing the schools. When so interpreted, it is apparent that the act does not confer arbitrary power on the State Board of Education.

Other matters are relied on, but we do not deem them of sufficient importance to merit discussion. It is sufficient to say that, after a careful consideration of all the objections, we are constrained to the view that the act is not repugnant to any provision of the Constitution, and is therefore valid.

On the cross-appeal it is insisted that the power to establish the schools carried with it not only the power to select the sites and see that proper buildings were erected and equipped, but the power to see that the schools were ready for the reception of pupils, and therefore the power to select the faculties. A case might arise where the word, "establish," might have the broad meaning contended for, but we do not believe that such was the purpose of the legislature. Since the schools, when established, were to be under the management and control of the State Board of Education, and such control would necessarily include the power to select the faculties of the schools, it is hardly probable that the legislature intended to confer the same power on the commission, and thus embarrass the State Board of Education when it undertook to exercise its unqualified right to decide such matter for itself. We therefore conclude that the act did not authorize the commission to select the faculties of the two schools.

As the judgment conforms to the views herein expressed, it follows that the judgment is correct.

Judgment affirmed both on the original and cross appeals.

Whole court sitting. Judge Moorman dissenting in separate opinion.

DISSENTING OPINION BY JUDGE MOORMAN.

I concur in the statements of the opinion that a legislative act should not be declared invalid until every doubt has been resolved in its favor, and that the propriety, wisdom or expediency of legislation is not a matter to be considered in measuring it by constitutional limitations and requirements. Nevertheless I am convinced that the act in question violates sections 27, 28 and 29 of the state Constitution, and I deem it appropriate that I state the reasons that impel that conviction.

It is undoubtedly true, and indeed seems to be conceded in the opinion, that the right to establish normal schools is a legislative function within which is embraced the power of selecting the sites, prescribing the character of buildings to be erected, and determining those questions that have to do with the founding, maintenance and operation of the schools. Starting therefore with that premise, let us see whether this act does in fact surrender the discretion and power of the legislature, or merely appoints an administrative agent to effectuate the expressions of the legislative will.

The title to the act does not read, "An act to establish two normal schools," but "To provide for the establishment of two normal schools," and the act itself does not establish the schools, unless it be by implication, but creates a State Normal School Commission which is "authorized and empowered to establish two new normal schools." It does not even appoint the commission or provide for its appointment by any executive officer of the state, but delegates to and vests in the speaker of the House of Representatives and the president of the Senate the legislative prerogative of selecting a commission to administer a legislative function. It further provides that one of the schools shall be located in the eastern and one in the western part of the state, and that the appropriation carried in the act shall become available

.for either of the schools when the commission shall have received for that school gifts of buildings or money, or both, equivalent in value to $100,000.00. It does not require the presiding officers of the respective houses to make known to the legislature the names of their appointees, nor are the members of the commission required to make any report of their proceedings. They are not required to take any oath or to be guided by any consideration in their activities except to locate one of the schools in the eastern and one in the western part of the state, and not to select a site until gifts of buildings or money, or both, equivalent in value to $100,000.00 shall have been received. No other restrictions are placed on the commission's powers, no injunction given to select those sites offering the most attractive inducements, affording the most advantageous facilities, or serving best the purposes of the schools and the educational interests of the state. But the power of locating and establishing the schools—assuredly a legislative function—is surrendered to an unnamed commission, responsible to no one, and controlled in the act itself by no limitations or requirements safeguarding the interests of the schools. This is the act that is said not to be a delegation of legislative discretion, but merely the appointment of an administrative agent to effectuate the declared will of the legislature.

It is a settled maxim of law that the power conferred upon a legislature to make laws cannot be delegated by it to any other body or authority. Cooley's Constitutional Limitations, 7th Ed., p. 163. This principle has been recognized by this court in many cases, among them Hydes, etc. v. Joyes, 4 Bush 464; Zable v. Louisville Baptist Orphans' Home, 92 Ky. 89; Town of Hardinsburg v. Mercer, 172 Ky. 661. So recently as May 4th of this year this court decided, in City of Harlan v. Coombs Land Co., 199 Ky. 87, that the legislative branch of a city government could not delegate to the executive of the city the power to employ a city engineer for a particular purpose. It must be admitted, however, that the legislature may, within constitutional limits, establish agencies to carry into effect its will according to prescribed standards. This it may do by establishing permanent boards, bureaus and commissions, which may administer laws complete within themselves. Such agencies are administrative branches of the government, acting

within prescribed limits and subject to judicial control in respect to the reasonableness of their acts, their findings of fact, and the powers that they may exercise under the legislative grant. It may also appoint a temporary commission to administer a purely legislative function according to express conditions, vesting in the commission the power to ascertain facts and regulate the details incident thereto upon which the law itself operates to the end of effectuating the legislative will. In either case the agency is limited to the doing of acts or the ascertainment of facts according to definite standards upon which the law operates to effectuate its declared purposes.

I do not therefore deny that the legislature had the power to create a commission for determining facts and regulating the details in reference thereto upon which the legislative will would operate to the end of establishing these schools. This act, however, does not confer upon the presiding officers of the respective houses, and their appointees, that administrative power, but vests in them the power to exercise legislative discretion and authority according to their own will and purposes.

Let us examine the act in the light of the powers that it confers and of the inability of the legislature to delegate its legislative functions. First it delegates to the presiding officers of the two houses the power to select the commission, the personnel of which was unknown to the legislature. That the right to select agents to act for the legislature is purely and exclusively a legislative function is indisputable. What then has the legislature done? It has conferred on its presiding officers the power that it alone possessed to select its administrative agent, which is precisely what the city of Harlan did and which this court held, in City of Harlan v. Coombs Land Company, *supra*, was a delegation of legislative authority. This alone is an insuperable objection to the legality of the act.

It is said, however, that the case just cited is not applicable, and that if the Constitution conferred "upon the legislature the power to appoint all inferior officers and agents, there might be some analogy between the two cases;" that the Constitution contains no such provision, but, on the contrary, gives to the legislature "full power to determine by whom the appointments of all inferior officers or agents may be made (section 93, Con-

stitution) subject to the qualifications laid down in the Sibert case that it may not itself make appointments to office." It will thus be seen that the distinction drawn in the opinion is that the power to appoint inferior officers and agents is given to the city council, but not to the legislature, whereas the legislature is given the power to determine by whom appointments of inferior officers or agents may be made. The Constitution says nothing about inferior or any agents. So in fact the distinction is drawn on the ground that the commissioners are officers, when in truth counsel for appellees, apparently anticipating the force and effect of the Sibert case, argue, and the opinion elsewhere recognizes the fact, that they are not officers but agents of the legislature for the performance of an administrative service. That part of section 93 of the Constitution relating to the selection of inferior officers provides: "Inferior state officers not specifically provided for in the Constitution *may be appointed or elected in such manner as may be prescribed by law,* for a term not exceeding four years, and until their successors are appointed or elected and qualified." The term "officer" as used in this section clearly contemplates a permanent position under a general law for a term of years, and not an agent of the legislature for the performance of a temporary service.

But assuming that the members of the commission are officers within the meaning of this provision, we have the anomalous situation, under the Sibert case, that the legislature cannot make the appointment, but it can delegate to two of its members, possessing no executive prerogatives in that respect, the power to make the appointment. In State, ex rel. v. St. Louis, 216 Mo. 94, cited with approval in the opinion in the Sibert case, it was said that "to provide by law the manner in which an appointment shall be made is one thing, to make the appointment is another; the one is in its nature legislative, *the other is essentially* executive." And in the same opinion, after quoting from Mr. Cooley on Constitutional Limitations, this court said, "that the authority of the legislature is limited to making such provisions by exercising its authority to pass an act containing them, and directing upon whom or with whom the power to appoint or elect was lodged, which electing and appointing agency should, perhaps, be selected from the department to which the duties of the office necessarily appertain."

The opinion then goes on to show that to sustain an act upholding the power of the legislature to select inferior state officers, such as the State Highway Commission, would empower the legislature to appoint or elect the private secretary of the governor, the attaches of this court, county school superintendents in all the counties, as well as tax commissioners, and practically all of the inferior officers of the state, and thus destroy the purpose of the makers of the Constitution in separating the powers of the government into its three distinct branches. Adopting that reasoning, this court held that the legislature could not select the members of the State Highway Commission, but it now holds, in distinguishing the case at bar from the Coombs Land Company case, that the members of the Normal School Commission are officers, that the legislature may delegate to two of its members who have no executive functions whatever, except to preside over its deliberations, the power of appointing those officers, thus enabling the legislature to do precisely in respect to inferior officers of the state, through two of its members, what, as was held in the Sibert case, it cannot do by its own vote. In my opinion the distinction sought to be drawn between the two cases not only indulges an unjustifiable interpretation of section 93 of the Constitution, but, in permitting the legislature to do through two of its members what it cannot do itself, exceeds the license of judicial logic.

Nor is the Coombs Land Company case distinguishable from the one at bar on the idea that the city council could not delegate its power to select an officer. The city in that case did not undertake to delegate the power to elect or appoint an officer of the city, but to select a *competent* engineer to supervise and direct a particular work. It was held, on the authority of Brick & Co. v. Barker, 22 Ky. Law Rep. 1069, that the city council, in the exercise of the plenary duties imposed upon it, might employ an engineer for a particular purpose; and furthermore, that the discretion could not be delegated, citing on the latter point Jameison v. City of Paducah, 195 Ky. 71, where it was held that the commissioners of a city of the second class could not delegate their authority to select an architect to draw plans and specifications for a particular work, even to a member of the board, as the authority involved the exercise of legislative discretion.

The discretion of selecting a legislative agent to perform an administrative act is exclusively legislative, and the legislature no more than a city council can delegate its authority to perform a legislative act. Hence the Coombs Land Company case and the authorities therein cited are, in my judgment, conclusive of this question.

Another equally potent reason for holding this act invalid is that it is a delegation of legislative authority to the commission, and not a grant of administrative power to be exercised according to definitely fixed standards. The difference between the exercise of legislative power and the performance of an administrative duty is defined in L. H. & St. L. Ry. Co. v. Lyons, etc., 155 Ky. 396, where the court said: "But these agents do not exercise any of the powers delegated to the legislature. They do not make any laws. They merely find the existence of certain facts, and to these findings of fact the law enacted by the legislature is applied and enforced." That opinion cites the Kentucky cases referred to in the opinion in this case, all of which hold that the authority of an administrative agent, whether the agent be a permanent arm of the government or merely acts in a temporary capacity for a particular purpose, is limited to the doing of acts or the ascertaining of facts according to prescribed standards upon which the legislative will operates to a definitely expressed end.

The authorities cited in the court's opinion clearly recognize these restrictions. In Kentucky Live Stock Breeders' Assn. v. Hager, Auditor, 120 Ky. 125, the only question was whether the appropriation of $15,000.00 for the State Fair was for a public purpose, and it was held, on the authority of Norman v. Board of Managers, 93 Ky. 537, in which an appropriation for the World's Fair was sustained, that it was a public purpose for which the state might appropriate and authorize an existing corporation to disburse money. Admitting that the act by which this appropriation was made attempted to establish a State Fair, in respect to which it was quite as indefinite as the one under consideration, it is nevertheless true that the decision in the Hager case has no application whatever to the question presented here, for this question was neither considered nor decided by the court in that case.

The later act of 1906, establishing and permanently locating the State Fair, section 4618b-1, et seq., of Ken-

tucky Statutes, cited as analogous to this act, is, however, applicable to the extent that it recognizes the necessity of establishing definite standards. It placed the fair under the control of the Board of Agriculture, Forestry and Immigration, and directed that board to locate the fair permanently "at the city or place *offering and affording, in the judgment of said board, the best inducements for its permanent location, taking into consideration financial inducements, the geographical location of the place, its railroad facilities, and all other matters pertaining to, or which would affect, the permanent welfare and interests of said fair.*" (Italics mine.) The board in that case ascertained the facts with reference to certain well-defined requirements of the statute, and the law operated on the facts as found to the end of fixing the permanent location.

Douglas Park Jockey Club v. Talbott, 173 Ky. 685, cited in the opinion, construed the act establishing the Racing Commission, section 3990-a, et seq., of Kentucky Statutes. It held that the power conferred on that commission was that of ascertaining the facts upon which the law would operate and permit racing. The decision was based on State Racing Commission v. Latonia Agricultural Assn., 136 Ky. 173, in which it was held that the statute was purely a police regulation. As to the powers of the commission the court in that case said: "The legislature declares what is the law, the commission ascertains the facts—that is, the situation—upon which the law is applied."

St. Louis & Iron Mountain Ry. Co. v. Taylor, 210 U. S. 281, rests upon Buttfield v. Stranahan, 192 U. S. 470, in which a statute preventing the importation of impure and unwholesome teas was involved. It was contended that the statute committed arbitrary discretion to the secretary of the treasury and vested in that official legislative power. In discussing the provisions of the statute the court said: "This, in effect, was the fixing of a primary standard, and devolved upon the secretary of the treasury the mere executive duty to effectuate the legislative policy declared in the statute."

In Connecticut Company v. Norwalk, 89 Conn. 528, an act creating a utilities commission and investing it with the control and supervision of public service corporations was assailed. In upholding it the court said: "Obviously the lawmaking body cannot know these, nor foresee changing conditions, and hence arises in many

574 KENTUCKY REPORTS. [Vol. 199.

cases, as did in this case, the propreity, if not the actual public necessity, *for committing the decision of this issue of fact* to an administrative tribunal. Legislation of this character, *having established the primary standard,* may devolve upon the administrative tribunal the executive duty of carrying out the purpose and policy of the statute.''

·In State, etc. v. McGraw, 43 Pac. Rep. 176, a commission was created to erect a state capitol. . The act provided that the capitol should be located on the old capitol grounds at a place ''most sightly and suitable therefor.'' The commission was directed to secure the submission of plans and designs ''appropriate to a capitol building'' at a cost of not exceeding one million dollars, and to select from them ''the most desirable plan and design,'' and to secure the erection and completion of the capitol building conformable to such plan and design. The act required the commission to ascertain facts upon which the law operated to fix the location and determine the character of the capitol.

Davenport v. Elrod, etc., 107 N. W. 833, was a proceeding to prohibit the State Capitol Commission of South Dakota from executing certain contracts, and it was held that the act was valid, but in that case the governor, secretary of state, state auditor, and commissioner of schools constituted the commission for procuring the erection of a building to be used for capitol purposes on a site described in the act. There the legislature ''fixed the location of the building,'' designated the purpose it was to serve, limited the cost of it, and in effect directed its construction as speedily as the means provided should permit. It was held that the function of the commission was merely administrative, and, although unlimited discretion could not be delegated, the directions given in that case were sufficiently definite to meet the objection of a delegation of legislative power.

In Territory, etc. v. Scott, et al., 20 N. W. 401, the validity of an act designating certain persons therein named as commissioners was assailed on the ground that it was a delegation of legislative authority. The act was held valid, but it contained detailed specifications and requirements by which the commissioners were to act. They were to select *''a suitable site,''* with due regard to its accessibility from all portions of the territory, and its general fitness for a capitol. Many other

requirements were imposed upon them, and it was rightly held that they were only administrative agents for the determination of facts which, having been done, would result in the application of the declared purposes of the law.

Merchants' Exchange of St. Louis v. Knott, 111 S. W. 565, involved an act authorizing the Board of Railroad & Warehouse Commissioners to establish state inspection of grain, with power to fix charges for the inspection. It was held valid, the court saying: "Observe, the legislature did not grant an unregulated power to the commissioners to fix fees. To the contrary, the grant was defined by firm, legislative lines drawn around it, and the commissioners might not fix fees above a maximum or below a minimum producing revenue—enough to cover the service. Their discretion was squeezed within those lines."

In State v. Cornvallis, 117 Pac. 980, a railroad commission act was held not to be a delegation of legislative power. But the ruling was based on the ground that the findings of the commission were administrative acts in respect to facts which, when determined, brought into operation the statute regulating such matters. This is precisely the theory on which our railroad Commission proceeds. It is merely an agency of the state, acting within the scope of its statutory authority for the purpose of ascertaining facts upon which the law operates with a determinative result.

State v. Bryan, 39 So. 929, is cited in the opinion as authority for vesting "absolute discretion and power" in a temporary commission created by the legislature. There certain institutions fostered and maintained by the state were abolished and a state university established. A designated agency of the state was authorized to select the location of the university after considering the lands, property, buildings and situation of the respective institutions abolished, and having regard to the permanent location of such an institution at some central point in the state, both geographically and as to population, as well as to the needs and requirements of the institution. Construing that act as a whole it seems clear that it does not vest absolute discretion in the commission, but only such discretion within prescribed rules and directions contained in the law, the effect of which was to confer on the commission the right to ascertain facts and do certain acts according to those rules upon which the law

was made effective. But if it be construed as giving to the commission "absolute discretion and power," as the majority opinion indicates, it is the only act of that character, so far as I have been able to find, that has ever been sustained.

The words, "gifts of land suitable for the purposes of each school," are referred to in the opinion as establishing an analogy between this and the Florida act. But the language quoted does not refer to the duties of the commission. It refers exclusively to the time when and the condition on which the appropriation shall become available. The act itself does not say, as in the Bryan case, that the schools shall be located at the most suitable place, nor even a suitable place, with regard to some central point, both geographically and as to population, or as to the needs and requirements of the institution. The two cases are clearly distinguishable.

The Supreme Court has said: "The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend." Field v. Clark, 143 U. S. 649. The authorities almost unanimously recognize this distinction, and all the cases cited in the opinion of the court, many of which I have referred to, carry the same recognition.

I concede, therefore, that if the legislature had selected a commission for the doing of certain acts or the determination of certain facts according to prescribed rules, upon which the law would operate to establish the schools, the act would be valid. But this the act fails to do. The commission is not required to locate the schools at the most suitable places, nor to consider the accessibility of the sites, the purposes of the law, or the educational interests of the state, but in utter disregard of all these matters it is left to its own purposes and will and given the arbitrary power of establishing the schools without any guide or chart by which the educational interests of the state might be served. None of the authorities cited in the opinion sustain the validity of such an arbitrary grant of power—a power that is undeniably legislative in its character. On the other hand, there are many decisions denying the validity of acts that delegate arbitrary discretion to an administrative or legislative agent.

In State v. Hocker, 63 Amn. St. Rep. 174, an act creating a state board of legal examiners, and providing for a uniform system of examination, was held unconstitutional because it clothed the board with power not only to apply the test of fitness to all applicants, but also to prescribe, by rules of its own adoption, the scope and character of the test, which was a matter of legislative discretion.

In State, etc. v. Carlisle, 138 S. W. 513, it was held that an act giving to the board of supervisors power to determine at what points grain or hay would be inspected was illegal because it was a delegation of legislative power.

In State v. Budge, 105 N. W. 724, the legislature sought to delegate to a board of capitol commissioners to be appointed by the governor the power to remodel and reconstruct the capitol building on its then site at Bismarck, North Dakota, and to erect a suitable residence for the governor on the lots owned by the state. It was recognized in that case, as indeed it is by all authorities, that the legislature cannot attend to the details of constructing a building, but nevertheless it was held that the act was a delegation of legislative authority in that the commission was not limited in its discretion as to what the residence and capitol should cost, except as to the aggregate amount of $600,000.00, and that the separate sums to be used for each building were matters to be determined by the legislature and not subject to delegation. The analogy between that case and the one at bar is apparent. The Normal School Commissioners are not limited in their selections to the most suitable sites, nor to those offering the largest gifts, although the two might concur. They are given the discretion to reject a million dollar gift in favor of a hundred thousand dollar gift, even though the former would secure a more suitable location for one of the schools.

In Merchants' Exchange v. Knott, 212 Mo. 616, it was held that a grain inspection act was invalid as a grant of legislative power because it gave to the commissioners the power capriciously to provide for the inspection and weighing of grain. The court said: "It is obvious that the foregoing grant of power is given without statutory landmark, compass, map, guide-post or cornerstone in one whit controlling its exercise. or pre-

scribing its channel, or indicative of any certain intendment of the legislative mind, beyond the mere grant.'' And further, ''If it had been certain in its intendment in these particulars, leaving to the commissioners to find the fact as within the statutory description, then another question might be here.'' There is in this case an express recognition of the rule that runs through all of the cases, that the legislature must declare the law which operates upon the facts found according to prescribed standards stated in the law. Other authorities sustaining this view are State of Maine v. Butler, 24 L. R. A. (N. S.) 744; Gilhooly v. City of Elizabeth, 66 N. J. L. 484; State of Wisconsin v. Thompson, 43 L. R. A. (N. S.) 339; O'Neil v. American Fire Insurance Co., 26 L. R. A. 715; Dowling v. Lancashire Insurance Co., 31 L. R. A. 112.

But it may be said that the commission could find two facts, viz.: That there is a location for one of the schools in western Kentucky and the other in eastern Kentucky, and that gifts of buildings or money, or both, equivalent in value to at least $100,000.00 had been offered, and upon the finding of those facts the law would operate to establish the schools. A complete answer to that suggestion, it seems to me, is that there could be no finding of fact according to definite standards with which the commission was bound to comply. The determination of a fact implies competition or controversy about which there must be a decision, as well as standards or descriptions with which it is to comply. This act establishes no rules by which the commission's deliberations shall be guided, it contemplates no competition or controversy as to the ascertainment of any fact or the determination of any question pertaining to the welfare of the schools, but surrenders to the presiding officers of the respective houses the power to appoint a legislative agent, and to that agent the right to establish schools without regard to the interests of the state. The power granted is arbitrary. Thereunder the commission has the right to select sites wholly inadaptable to schools, though suitable sites are available, to accept gifts equivalent to $100,000.00 in value, rejecting offers of a million dollars for better locations, and to accept gifts of buildings or land that could not be utilized for school purposes. Who could restrain it from doing any of these things? No one. Then how can it be said that its powers are not arbitrary and unrestrained.

Reference is made to the location of one of the schools in eastern Kentucky and the other in western Kentucky, and to the gifts amounting to $100,000.00 each, as an evidence of the validity of the act. Those facts, as I view them, are wholly beside the question, for the constitutional validity of a law is not to be decided by what has been done under it, but by what may be done. Montana Co. v. St. Louis M. & M. Co., 152 U. S. 160. Granting, therefore, that the appointment of the commission and the selection of the sites had the qualities of disinterestedness, it is nevertheless true that the validity of the act must be measured by what could be done under its terms and not by what was done. Measured by this potentiality, it does not require an imaginative mind to perceive that the legislature surrendered its prerogatives to the arbitrary discretion of the commission, which is authorized to exercise an unrestrained judgment, or, if it cares to do so, to subordinate the educational interests of the state to any selfish or even vicious influence to which it might be subjected. And all this the commission can do with the cause of education to which the state is committed in the interest of those who some day must control her policies.

It is however said that if this act is stricken down many useful acts must fail for the same reason. A sort of contemporaneous construction is invoked as a reason for upholding the act. The rule of contemporaneous construction, as I understand it, means uniformity of construction. That rule not only does not apply to this act, but, with the possible exception of the first State Fair act, in respect to which this question was never raised, there is not a single precedent for it. Reference is made to three acts as authority for this view. None of them in my opinion sustains it.

The act establishing the branch penitentiary is first cited as a precedent. Acts 1883-84, p. 82. There the governor was authorized to appoint a board of building commissioners for the erection of a branch penitentiary "at or near Eddyville." The commissioners were required to purchase sufficient ground for gardening purposes, and the raising of live stock and other food supplies needed at the prison, not to exceed in value $4,000.00. They were enjoined to have due regard for the health of prisoners, for accessibility by rail and river, and for proximity to such materials as might be needed for man-

ufacturing purposes. The building plans could not be adopted until approved by the governor and the auditor of public accounts. The capacity of the buildings could not be less than 400 cells. The commissioners were required to take an oath faithfully to discharge their duties and to execute a bond to the Commonwealth in the sum of $10,000.00 each. Many other requirements and restrictions were placed on the commissioners. Their powers were confined to a narrow scope, and their discretion was circumscribed by standards that limited it to the ascertainment of facts upon which the law itself would operate.

Nor is the act to establish a normal school for colored persons, approved May 18, 1886, cited as similar to the act under consideration, applicable. That act provided that "there shall be established and maintained  .  .  . a state normal school for colored persons," not for the appointment of a commission that was authorized to establish the school. The governor was authorized to appoint the commission subject to the approval of the senate. The commissioners were directed to receive bids from different parts of the state for donation of grounds and buildings or funds, and to locate the school at such place "as shall obligate itself for the largest donation," provided "such place shall possess reasonable facilities for the success of said school." There the commission was restricted to the determination of facts or the doing of acts according to prescribed standards upon which the law became effective, and it was not given, as is done in this case, the right to exercise a discretion that might or might not represent the legislative purpose.

The act to establish houses of reform, approved March 21, 1896, is also wholly different. That act established two institutions known as houses of reform, placed the supervision of the institutions under a board of trustees to be appointed by the governor, empowered the board to receive "by gift or purchase, suitable building sites for said institutions," consisting of tracts of land of not less than 100 acres, "in healthy locations," not less than three miles from the corporate limits of a town, and "to erect *suitable* buildings" thereon, and properly "equip, appoint and furnish the same." The act particularly described the plan of buildings to be constructed. So in that instance, also, the powers granted were administrative in the sense that the trustees were

permitted to determine facts upon which the law complete within itself became effective.

No other law has ever been passed by the legislature of this state vesting in the presiding officers of that body the legislative power of selecting legislative agents, nor has any other law ever been passed by which such an agency has been invested with arbitrary powers so vitally affecting the interests of the state. This court has frequently said that a lawmaking body cannot delegate its functions. If the legislative power of a city to prescribe the character of sidewalks to be constructed cannot be delegated to the city engineer, as was held in Hydes, etc. v. Joyes, *supra,* how can the legislature of the state confer upon a commission appointed by two of its members the power to locate normal schools and prescribe the character of buildings to be constructed? If it is beyond the power of a city council to delegate to the mayor its authority to select an engineer for a particular purpose, as decided in City of Harlan v. Coombs Land Co.; how can the legislature delegate to its presiding officers the legislative power of selecting legislative agents to perform a particular administrative service? No refinement of argument can distinguish those cases from the one at bar, no process of reasoning can strike down the legislative act in one case and uphold it in the other.

For these reasons I believe that the opinion is a radical departure from former decisions of this court, from established principles of law and from constitutional tenets. I therefore dissent from its rulings.